THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LONZA HOLMES, Defendant-Appellant.

First District (1st Division)   No. 1—86—2447

Opinion filed December 4, 1989.—Rehearing denied July 18, 1990.

Randolph N. Stone, Public Defender, of Chicago (Bruce C. Landrum, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Lauren E. Brown, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MANNING delivered the opinion of the court:

The defendant, Lonza Holmes, was indicted in the circuit court of Cook County for murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), home invasion (Ill. Rev. Stat. 1985, ch. 38, par. 12—11(a)(2)), robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—1(a)), armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2(a)), and residential burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—3). Following a bench trial the defendant was found guilty of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2), and not guilty of home invasion, robbery, armed robbery and residential burglary. Thereafter, the defendant was sentenced to 10 years' imprisonment in the Illinois Department of Corrections.

On appeal, defendant alleges that: (1) his fourth amendment rights were violated when he was arrested without probable cause; (2) the trial court erred in its finding that the defendant's statements were voluntary and in its denial of the defendant's motion to suppress the evidence derived from an illegal arrest; and (3) he was denied a fair sentencing hearing when the trial court improperly considered a "victim impact letter" written by the victim's mother.

Detective Frank Glynn testified at a suppression hearing that on May 30, 1985, he, along with Detectives George Baslie, Jack Hines and Sammy Lacey, was investigating the death of David Ward (deceased). While at the scene of the murder, which occurred at David Ward's home, Detectives Glynn and Baslie observed the deceased lying facedown in a pool of blood with head injuries and one of his feet touching the front door. His pockets were turned "inside out," and he was wearing a smashed watch with the time stopped at 1:10. Detective Glynn also noticed a box of Newport cigarettes and two ashtrays containing Tareyton 100's and Newport cigarette butts on the couch. Subsequent to examining the scene of the incident, Detective Baslie spoke with Brian Simms and Jack Anderson, neighbors of the deceased, who informed him that they saw the deceased with the defendant at 9 p.m. and 2 a.m., respectively. Detectives Glynn and Baslie then walked to the defendant's house, where it was verified by

the defendant's mother, Ora Lee Holmes, and his brother, Edward Holmes, that the defendant had been with the deceased on the previous evening. Since the defendant was not at home at that time, Detective Glynn left his card and requested that the defendant either call or come to the police station for questioning. At approximately 9:30 p.m., Detective Glynn received a telephone call informing him that the defendant was now at home. Upon their arrival at the defendant's home, the detectives explained to the defendant that they were investigating the death of David Ward and asked the defendant to come to the Area 2 police station. The defendant stated that he did not have a ride. Therefore, he accompanied the detectives to Area 2.

Detective Glynn further testified that, while driving to the police station, he did not tell the defendant that he was under arrest nor was the defendant handcuffed. Moreover, he did not tell the defendant that he had to go to the police station. They arrived at the police station on May 30, 1985, at approximately 10 or 10:30 that evening. The defendant was escorted to a large conference room and advised of his *Miranda* rights. During this period of questioning, which lasted about an hour, Detective Glynn observed that the defendant smoked Tareyton 100's cigarettes, and the defendant told the detectives that on the previous night he was wearing a "two-tone brown shirt and light brown slacks." The questioning subsided while the detectives "checked-out" the information provided by the defendant. The questioning resumed at 1 a.m., and the defendant was again given his *Miranda* rights. When the defendant stood up and reached for his cigarettes, Detective Glynn noticed that the defendant was wearing a pair of tan pants underneath his blue jeans with a bloodstain on the cuff of the left pant leg. When Detective Glynn questioned the defendant about the bloodstains, the defendant stated that the bloodstains resulted from the injury suffered by David Ward on the previous evening when David Ward had injured his nose on his screen door. Thereafter, the detectives asked the defendant to remove his blue jeans in order to see the rest of the tan pants. Upon their removal, the detectives noticed blood splatterings all over the tan pants. Detective Glynn then took the bloodstained pants, sent them to the police crime lab to be analyzed, and told the defendant to put the keys that the defendant had taken from his pocket back into his pocket. The defendant responded, "[T]hose are not my keys, those are David's keys." This line of questioning took about an hour. At approximately 2 a.m. after discovery of the bloodstained pants, Detective Glynn placed the defendant under arrest.

Detective Glynn further testified that prior to 4 a.m. on May 31,

1985, the defendant was never placed in handcuffs nor did the defendant ever ask to leave the police station after his arrival. Detective Glynn also stated, if the defendant had attempted to leave the police station he said he "would have asked him why." Detective Glynn testified that he could not answer what he would have done since the defendant did not attempt to leave. However, the defendant freely moved in and out of the interview room to use the restroom and get coffee. Additionally, Detective Glynn testified that although the time entered on the consent to search form was 11:45 p.m., the defendant did not sign the form until after 1 a.m. Finally, Detective Glynn testified that he told the defendant that he would remain in custody until he signed the consent to search form in order that the police could look for his shirt.

Detective Jack Hines testified that he prepared the consent to search form at 11:45 p.m. However, since he had other things to do, he did not immediately go to the room where the defendant was located, and the defendant did not sign the form until about 2 a.m.

The defendant moved to quash the arrest and suppress the evidence flowing from that arrest, arguing that he was illegally arrested without probable cause. The trial court denied this motion, reasoning that in light of the defendant's freedom of movement at the police station, no arrest took place until the defendant's bloodstained pants were discovered.

The State then proceeded with the defendant's motion to suppress his statements. Detectives Glynn, Hines, Lacey and Dignan testified that they did not beat, physically abuse, threaten or holler at the defendant. Detective Hines testified that he was present while the defendant was being questioned by Detective Glynn. In addition, at various times during the questioning, Detectives Baslie and Lacy and Lt. Burge were present. After the defendant was placed under arrest, Detective Hines took him to the lock-up for processing and subsequently returned him to the conference room. Detective Hines further testified that as late as 4:15 a.m., when his tour of duty ended, the defendant was not handcuffed.

On May 31, 1985, at approximately 9 a.m., Detectives Dignan and Madigan questioned the defendant for about an hour after giving him his *Miranda* rights. Detective Dignan testified that when they entered the room at 9 a.m. to question the defendant, he was handcuffed to a ring. He proceeded to remove the handcuffs, and at that time the defendant appeared to be fine physically. They returned to the interview room at 3 p.m. for a second interview with the defendant. After this interview, Detectives Dignan and Madigan took the

defendant to his home to obtain more clothing and to allow the mobile crime unit to further process the scene of the crime. Specifically, they went to look for a board, previously described by the defendant as the weapon used by him to strike the decedent with in the head. Detective Dignan further testified that they noticed the defendant's blood-stained pants during the first interview at 9 a.m., but his clothing was not taken from him until the 3 p.m. interview.

Detective Madigan testified that he and Detective Dignan took the defendant back to his home after the 3 p.m. interview to allow the defendant to speak with his family and to look for the board, which they were unable to find. He further testified that he questioned the defendant alone at 5 p.m. after giving the defendant his *Miranda* rights. During this conversation the defendant stated that he and the deceased had been drinking together on the evening of March 30, 1985. The defendant confronted Ward about some money that Ward allegedly owed him, and he became upset because Ward had no money to pay him but had money to buy cocaine. The defendant then demanded the money or the cocaine. Ward turned and slapped the defendant in the face. The defendant responded by hitting Ward three times over the head with a board that he had gotten from Ward's backyard. The defendant also took $40 out of Ward's pocket, threw the board in an alley and proceeded to a service station, where he bought cocaine. The next day defendant called the police after being informed that the police were looking for him. Detective Madigan also testified that the defendant changed his story during the 5 p.m. interview from that given during the morning interview. The defendant acknowledged that he had lied during the morning interview but said he decided to tell the truth during the 5 p.m. interview because the police had possession of the bloodstained pants and were aware of the argument involving the cocaine.

Lieutenant John Burge testified that as the commanding officer of the Area 2 violent crimes unit he was aware that the defendant was being questioned in the conference room on the second floor by the detectives assigned to investigate the death of David Ward. He stated that, although he was not personally involved in the investigation, on several occasions he either listened outside of the door or briefly went into the conference room to listen to the conversations the detectives were having with the defendant.

McKinley Holmes, defendant's brother, testified that when the defendant came home, on May 31, 1985, at approximately 4 p.m., the defendant's face and eyes were swollen, and he had a bruise under his forehead. He gave the defendant fresh clothes and later brought food

to the defendant at the police station. However, the defendant did not eat the food because he was too sore to eat as a result of the beatings that he had received from the police. McKinley informed Lt. Burge of the beating and then contacted "People's Alert."

Assistant State's Attorney James Kogut testified that on May 31, 1985, he had a conversation with the defendant, who agreed to make a statement after he was advised of his *Miranda* rights. Kogut reduced the defendant's statement to writing; and while Kogut was reading the statement to him, the defendant was eating fried chicken that his brother had brought to him. The defendant then signed the line under the *Miranda* warnings. However, he did not sign the statement itself because his family advised him not to sign anything. Kogut also testified that he did not observe any injuries on the defendant nor did the defendant complain that he was injured or threatened by the police.

Cecelia Chavez, a medical technician at Cermak Health Services, testified that she completed a physical examination of the defendant on June 1, 1985. The defendant told her that he had received "a blow to the head"; however, she did not know when the injury occurred. Further, she did not see any bruises or current injury to the defendant. However, on June 11, 1985, and June 13, 1985, the defendant did complaint about headaches that he had been experiencing, and he informed the doctors that he had been hit on the head with a board.

The defendant testified that when he initially arrived at the police station he was placed in a room, handcuffed and questioned for two hours without being given any *Miranda* rights. During this time he requested to see a lawyer and his family. Defendant stated that both of these requests were denied by Lt. Burge. Defendant further testified that Lt. Burge asked him to remove his outer pair of pants; and after seeing the blood on the pants underneath, he slapped him, accused him of committing the crime and sent the clothes to the crime lab to be analyzed. Defendant was then transferred to a second room for further questioning. Defendant testified that for three hours he was handcuffed to a bar in an interview room with the air-conditioning turned up, and he was wearing only a T-shirt and jogging pants. Subsequently, an officer entered the room, loosened his handcuffs and gave him a sandwich. Thereafter, Lt. Burge entered the room, tightened the handcuffs and took the sandwich.

The defendant testified that he was interrogated and threatened by Lt. Burge and Detectives Lacy and Hines. Several hours later Lt. Burge and three other officers returned to the room. After being hit with a Chicago telephone book and kicked by Lt. Burge and Detective

Madigan, the defendant agreed with Lt. Burge's version of Ward's death, and Lt. Burge reduced the statement to writing. Later that afternoon the defendant was driven to an alley behind the decedent's house by Detectives Madigan and Dignan. He was also driven to his home, where he received additional clothing from his brother, Jesse. Thereafter, he was returned to the police station and interviewed by an assistant State's Attorney. The defendant's brother later brought some food to the police station, but he could not eat the food due to the pain he was experiencing from the beating that he had received from the police. The defendant stated that he did not receive any medical attention until seven days later when he complained of his injuries. The defendant also testified that he did not take any money from the deceased. He further stated that the conversations with the deceased which led to the struggle did not concern money. Instead, the conversations pertained to the wife of the deceased, Shirley Ward.

The trial court denied the defendant's motion to suppress statements; and following a bench trial, the defendant was found guilty of voluntary manslaughter. At the sentencing hearing, the mother of the decedent submitted a "victim impact letter" to the court for consideration. Following arguments in aggravation and mitigation, the defendant was sentenced to 10 years' imprisonment in the Illinois Department of Corrections.

■ The defendant first contends on appeal that his fourth amendment rights were violated when he was taken into custody, transported to the police station and detained for interrogation without probable cause to arrest. Therefore, he asserts the evidence derived from that illegal arrest should have been suppressed. It is well-settled that a trial court's decision regarding a motion to suppress evidence will not be disturbed on review unless it is manifestly erroneous. (*People v. Collins* (1989), 182 Ill. App. 3d 362, 364, 538 N.E.2d 781; *People v. Evans* (1988), 125 Ill. 2d 50, 78, 530 N.E.2d 1360; *People v. Gacho* (1988), 122 Ill. 2d 221, 237, 522 N.E.2d 1146.) Moreover, a trial court's determination that there was probable cause to arrest will not be disturbed by a court of review unless it is manifestly erroneous. *Evans*, 125 Ill. 2d at 71; *People v. Foster* (1987), 119 Ill. 2d 69, 83, 518 N.E.2d 82, *cert. denied* (1988), 486 U.S. 1047, 100 L. Ed. 2d 628, 108 S. Ct. 2044.

The task of a court of review in analyzing a probable cause question is simply to ensure that the trial court had a substantial basis for concluding that probable cause existed. (*Illinois v. Gates* (1983), 462 U.S. 213, 238-39, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332; *People v. Tisler* (1984), 103 Ill. 2d 226, 248, 469 N.E.2d 147.) Therefore, we

must first determine whether the trial court properly concluded that probable cause existed to arrest the defendant. Our courts have frequently held that probable cause to arrest exists when the facts and circumstances within the knowledge of the arresting officer are sufficient to justify the belief of a reasonably cautious person that an offense has been committed and the person that was arrested committed the offense. Ill. Rev. Stat. 1987, ch. 38, pars. 107—2(1)(a), (c); *People v. Montgomery* (1986), 112 Ill. 2d 517, 525, 494 N.E.2d 475, *cert. denied* (1987), 479 U.S. 1101, 94 L. Ed. 2d 181, 107 S. Ct. 1330; *People v. Lippert* (1982), 89 Ill. 2d 171, 178, 432 N.E.2d 605; *People v. Lekas* (1987), 155 Ill. App. 3d 391, 410, 508 N.E.2d 221, 234.

■ In the instant case, we are satisfied with the trial court's finding that no arrest occurred until the detectives discovered the bloodstained pants. The record discloses that the defendant voluntarily accompanied the police officers to the police station; and he was not handcuffed, fingerprinted nor subjected to a custodial interrogation until after the bloodstained pants were discovered. It is true that the defendant was questioned by the police for several hours prior to the discovery of the bloodstained pants. However, questioning by the police during an investigation does not alone constitute a fourth amendment violation unless the defendant is taken into custody by the police without probable cause to arrest. (*People v. Long* (1983), 99 Ill. 2d 219, 230, 457 N.E.2d 1252, 1256.) Further, this court has repeatedly held that every interrogation held at a station house is not necessarily a custodial interrogation, indicating an arrest. *People v. Longoria* (1983), 117 Ill. App. 3d 241, 251, 452 N.E.2d 1350; *People v. Reed* (1982), 104 Ill. App. 3d 331, 335, 432 N.E.2d 979; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

The defendant's reliance on *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, and *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103, to support his contention that his fourth amendment rights were violated is misplaced. The facts in *Dunaway v. New York* and *People v. Townes* are distinguishable from the case at bar. In *Dunaway v. New York*, the victim was killed during an armed robbery, and the detectives were ordered to "pick up" the defendant and "bring him in" even though they did not have enough information to secure a warrant for his arrest. The defendant was involuntarily taken to the police station; and the evidence revealed that, although he was not told that he was under arrest, he would have been physically restrained had he refused to accompany the officers or had he attempted to leave the police station. Furthermore, in *Dunaway v. New York*, the defendant was seized without

probable cause for the purpose that something might "turn up" or as an "expedition for evidence."

In the present case, the police were not ordered to "pickup" the defendant. To the contrary, the police asked the defendant if he would come to the police station for questioning. It was only after the defendant stated that he did not have a ride that he accompanied the detectives to the Area 2 police station. Moreover, none of the detectives testified that the defendant would have been physically restrained had he attempted to leave. In *People v. Townes*, the defendant was asked to go to the police station for questioning as a part of a rape investigation. The defendant was then given the option of driving his own car or accompanying the police officers in the police car. The defendant chose the latter. He arrived at the station at 9:30 a.m., and after several hours of interviews, the defendant was placed in a lineup. However, the victim was unable to identify him. Five interviews were conducted during the 12 hours that the defendant was detained at the police station, and he was given his *Miranda* warnings prior to each interview. During his fifth interview between 6 p.m. and 10:10 p.m., he admitted to having consensual sexual relations with the victim. The court in *People v. Townes* concluded that the defendant's fourth amendment rights were violated when he was subjected to a lengthy interrogation at the police station without probable cause.

In the case at bar, the record demonstrates that defendant freely moved about the station and was not detained until the bloodstained pants were discovered. Conversely, there was nothing in the facts of *People v. Townes* to suggest that the defendant had any freedom of movement. Moreover, the victim in *People v. Townes* was only able to provide a general description of her attacker, and based on the information provided, the defendant's name was included on a list of seven suspects. In the instant case, several witnesses actually saw the defendant with the deceased on the date of the crime, and one witness saw them together as late as 2 a.m. Therefore, since the police were investigating the death of David Ward and neighbors identified the defendant as the last person to be seen with the deceased, they wanted to question him. It is undisputed that the defendant went to the police station voluntarily; and during a criminal investigation, police officers may question citizens and citizens have a duty to cooperate with the police. *People v. Longoria*, 117 Ill. App. 3d at 249; *People v. Miller* (1980), 89 Ill. App. 3d 973, 977, 412 N.E.2d 175, *cert. denied* (1981), 454 U.S. 871, 70 L. Ed. 2d 175, 102 S. Ct. 339.

In determining whether a seizure has occurred, the court must review all the circumstances surrounding the incident and determine

whether a reasonable person, innocent of any crime, would believe that he was under arrest or not free to leave. (*United States v. Mendenhall* (1980), 446 U.S. 544, 554, 64 L. Ed. 2d 497, 509, 100 S. Ct. 1870, 1877; *Longoria*, 117 Ill. App. 3d at 249.) Prior to the discovery of the bloodstained pants there were no indicia of an arrest. In addition to the defendant voluntarily accompanying the detectives to the police station and not being fingerprinted, photographed or handcuffed, he was given a great deal of freedom of movement while at the police station by being allowed to freely move from room to room unescorted in order to get coffee and use the restroom. In light of the totality of the circumstances, a reasonable person would have believed that he was not under arrest and was free to leave the police station. Accordingly, we conclude that the trial court properly determined that no seizure occurred until after the discovery of the bloodstained pants. We further conclude that the trial court's finding that there was probable cause to arrest was not contrary to the manifest weight of the evidence. Under the facts of this case, the trial court properly denied defendant's motion to quash arrest and suppress statements.

■■ ■ The defendant next contends that the trial court's finding that his confession was voluntary was against the manifest weight of the evidence in light of the police officer's inconsistent testimony. Although the defendant's written statement was not signed, the trial court determined that the written statement was voluntarily made; and based on the actual signing of the *Miranda* rights, the defendant knowingly and intelligently waived his rights. The voluntariness of a statement depends upon the totality of the circumstances, and a trial court's finding that the statement was voluntarily made will not be disturbed on review unless it is contrary to the manifest weight of the evidence. (*Evans*, 125 Ill. 2d at 77; *People v. Rogers* (1988), 123 Ill. 2d 487, 495, 528 N.E.2d 667, *cert. denied* (1989), 488 U.S. 1046, 102 L. Ed. 2d 1001, 109 S. Ct. 878; *People v. Clark* (1986), 114 Ill. 2d 450, 457, 501 N.E.2d 123.) The defendant argues that he was severely beaten by Detective Madigan and Lt. Burge during the morning hours of May 31, 1985, until he confessed to committing the crime. Moreover, the defendant's brother testified that he observed bruises on the defendant when he visited him at the police station. However, the record reveals that Lt. Burge did not report for duty on that day until 4 p.m. Moreover, the assistant State's Attorney testified that he did not observe injuries on the defendant, and the defendant did not complain that he had been injured by the police. Further, the medical technician, who completed a physical on the defendant on June 1, 1985, testified that she did not see any bruises or current injury to the defendant.

The defendant further argues that the testimony of the detectives, regarding when the bloodstained pants were found and the handcuffing of the defendant, was inconsistent, unreliable, and against the manifest weight of the evidence. It is well established that in an evidentiary proceeding, wherein the trial court is the trier of the facts, it is the responsibility of the trial court to determine the credibility of witnesses and the weight to be given their testimony and to draw reasonable inferences from the evidence. *People v. Jimerson* (1989), 127 Ill. 2d 12, 43, 535 N.E.2d 889; *People v. Titone* (1986), 115 Ill. 2d 413, 422, 505 N.E.2d 300.

Detective Dignan testified that when he and Detective Madigan entered the room on May 31, 1985, at 9 a.m., the defendant was handcuffed to a ring. Detective Glynn testified that prior to 4 a.m. on May 31, 1985, the defendant was never placed in handcuffs, and Detective Hines testified that the defendant was not handcuffed as late as 4:15 a.m. After reviewing this testimony, we have determined there is no inconsistency.

We recognize that there was a discrepancy in the testimony as to when the bloodstained pants were discovered. Detective Glynn testified that the pants were discovered and taken during the 1 a.m. questioning, and Detective Madigan testified that the pants were not taken until the 3 p.m. interview. It is the responsibility of the trier of fact to resolve any conflicts in the evidence (*People v. Slim* (1989), 127 Ill. 2d 302, 307, 537 N.E.2d 317; *People v. Berland* (1978), 74 Ill. 2d 286, 305-06, 385 N.E.2d 649), and a court of review will not substitute its judgment for the trier of fact when the evidence is merely conflicting. (*People v. Woods* (1980), 81 Ill. 2d 537, 542, 410 N.E.2d 866.) We, therefore, conclude that based on the totality of the circumstances, the finding by the trial court that the defendant's statements were voluntarily made is not against the manifest weight of the evidence.

Although the defendant failed to raise this issue before the trial court, he now argues that his sentence should be vacated and his cause remanded for a new sentencing hearing, where the trial court improperly considered the testimony and a prejudicial and irrelevant "victim impact letter" written by Helena Ward, the deceased's mother. The defendant further argues that failure of defense counsel to object to the evidence presented by Ms. Ward constituted ineffective assistance of counsel pursuant to *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. The State argues that this issue was not properly preserved for review and has been waived since the defendant failed to object to the admission of

the "victim impact letter" or to Ms. Ward's testimony. We find the defendant's argument to be without merit.

■■ ■ Our courts have held that the failure of counsel to object to the admission of evidence serves as a waiver of that issue on appeal. (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233; *People v. Newbury* (1972), 53 Ill. 2d 228, 238-39, 290 N.E.2d 592.) We have further held that the failure to raise an issue in a written post-trial motion operates as a waiver of that issue on appeal. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183; *People v. Szabo* (1986), 113 Ill. 2d 83, 93, 497 N.E.2d 995.) Furthermore, our supreme court has recently held that in order to preserve an issue on appeal there must be *both* a trial objection *and* a written post-trial motion raising the alleged error. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) In the case at bar, defense counsel failed to object to the admission of the "victim impact letter" or Ms. Ward's testimony. Moreover, defense counsel failed to raise these objections in the defendant's post-trial motion. Therefore, these objections may now be deemed waived. *People v. Jones* (1988), 123 Ill. 2d 387, 410, 528 N.E.2d 648; *People v. Whitehead* (1987), 116 Ill. 2d 425, 447, 508 N.E.2d 687.

■■ ■ The waiver rule is not a complete bar to appellate review. (*People v. Crews* (1988), 122 Ill. 2d 266, 275, 522 N.E.2d 1167.) Instead, it serves as a rule of administrative convenience rather than jurisdiction. (*People v. Smith* (1985), 106 Ill. 2d 327, 333, 478 N.E.2d 357.) Pursuant to Rule 615(a), this court may in the interest of justice take notice of all issues which appear to be plain error or defects affecting substantial rights even if these errors were not brought to the attention of the trial court. (107 Ill. 2d R. 615(a); *People v. Britz* (1988), 123 Ill. 2d 446, 486, 528 N.E.2d 703; *Enoch*, 122 Ill. 2d at 189.) Additionally, if the evidence is closely balanced, the plain error doctrine may be invoked in reviewing a sentence. (*People v. Martin* (1988), 119 Ill. 2d 453, 458, 519 N.E.2d 884; *People v. Garcia* (1983), 97 Ill. 2d 58, 87, 454 N.E.2d 274.) Our courts have determined that the admission of a victim impact statement may be reviewed under the plain error rule. (*People v. Phillips* (1989), 127 Ill. 2d 499, 536, 538 N.E.2d 500; *People v. Simms* (1988), 121 Ill. 2d 259, 272, 520 N.E.2d 308.) The evidence in this record is not closely balanced nor does it indicate that the defendant was denied a fair and impartial trial. Therefore, under the facts of this case, we decline to invoke the plain error doctrine.

However, if we were to consider the merits of defendant's conten-

tion, we need only to look to recent supreme court decisions addressing the admission of victim impact statements in light of *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529. (See *People v. Felella* (1989), 131 Ill. 2d 525; *People v. Turner* (1989), 128 Ill. 2d 540, 539 N.E.2d 1196; *Phillips*, 127 Ill. 2d 499, 538 N.E.2d 500; *Crews*, 122 Ill. 2d 266, 522 N.E.2d 1167.) In *Booth v. Maryland*, a very lengthy and emotional victim impact statement was read to the jury at a death penalty sentencing hearing. The court reasoned that the use of the statement at the sentencing hearing was error since the emotional effect of the crime on the victim's family would divert the jury's attention from considering the circumstances of the crime and the character of the defendant. The *Booth v. Maryland* court stated that, "Our disapproval of victim impact statements at the sentencing phase of a capital case does not mean, however, that this type of information will never be relevant in any context. Similar types of information may well be admissible because they relate directly to the circumstances of the crime. Facts about the victim and family also may be relevant in a noncapital criminal trial. Moreover, there may be times that the victim's personal characteristics are relevant to rebut an argument offered by the defendant." *Booth*, 482 U.S. at 507 n.10, 96 L. Ed. 2d at 451 n.10, 107 S. Ct. at 2535 n.10.

Our supreme court has recently held that *Booth v. Maryland* should not be extended to noncapital cases. (*People v. Turner* (1989), 128 Ill. 2d 540, 578, 539 N.E.2d 1196; *People v. Felella* (1989), 131 Ill. 2d 525, 535.) We also note that neither the testimony of Ms. Ward nor the information contained in the "victim impact letter" violated the holding of *Booth v. Maryland*. To the contrary, in this noncapital criminal trial the defendant testified that David Ward attacked him. Therefore, Ms. Ward's testimony which reiterated her beliefs that were expressed in the letter was relevant to rebut the defendant's claim that the deceased was the aggressor. In *People v. Crews*, the court noted the distinction between a sentencing hearing conducted before a jury and one before a trial judge alone. Although the trial judge in the instant case made reference to the testimony of several witnesses presented in aggravation and mitigation by the families and friends of both David Ward and the defendant, the record does not support the defendant's contention that the trial court particularly considered the victim impact letter or Ms. Ward's testimony when sentencing the defendant. Moreover, the trial court recognized that incarceration of the defendant would not serve as rehabilitation but rather that a period of imprisonment would operate as a deterrent to others. See Ill. Rev. Stat. 1985, ch. 38, par. 1005—5—3.2.

It is well settled that the trial judge's sentencing decisions are entitled to great weight and deference, and a sentence may not be altered by a court of review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Plantinga* (1985), 132 Ill. App. 3d 512, 522, 477 N.E.2d 1299.) A sentence of not less than four years and not more than 15 years' imprisonment may be imposed for voluntary manslaughter. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(4).) Although pursuant to Supreme Court Rule 615(b)(4) we have the discretionary power to reduce an excessive sentence (107 Ill. 2d R. 615), the trial judge is in a superior position to consider and determine the punishment to be imposed rather than a court of review. (*Perruquet*, 68 Ill. 2d at 154.) Even though the defendant asserts that the trial court considered improper evidence at the sentencing hearing, our supreme court has frequently held that the trial court will be presumed to have considered only reliable and competent evidence when it serves as the sentencer. *Phillips*, 127 Ill. 2d at 537; *Whitehead*, 116 Ill. 2d at 455; *People v. Hall* (1986), 114 Ill. 2d 376, 419, 499 N.E.2d 1335.

It is undisputed that the defendant killed David Ward. Further, the record does not provide any evidence to rebut the presumption that the trial court only considered competent evidence in imposing sentence on the defendant. Therefore, on this record, we are satisfied that the "victim impact letter" was not relied on by the trial judge in imposing a 10-year sentence on the defendant. We further conclude that, if there was any error in the admission of the victim impact letter or Ms. Ward's testimony into evidence, it must be considered as harmless beyond a reasonable doubt. See *Phillips*, 127 Ill. 2d 499.

In light of our disposition of defendant's contentions concerning the "victim impact letter" and the defendant's failure to show that he was prejudiced by the admission of the evidence as required by *Strickland v. Washington*, it is not necessary to consider the defendant's allegation that he was denied effective assistance of counsel due to defense counsel's failure to object to the admittance of the "victim impact letter" and testimony of Ms. Ward. (See *Phillips*, 127 Ill. 2d at 537-38.) Accordingly, for all of the above reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

CAMPBELL and QUINLAN, JJ., concur.