650 N.E.2d 250 (1995)
272 Ill.App.3d 394
208 Ill.Dec. 793
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
Robert ALLEN, Defendant-Appellant.
No. 1-93-1471.
Appellate Court of Illinois, First District, Third Division.
March 31, 1995.
As Modified on Denial of Rehearing May 10, 1995.
*252 Rita A. Fry, Cook County Public Defender, Chicago (James N. Perlman, of counsel), for appellant.
Jack O'Malley, State's Atty. of Cook County, Chicago (Renee Goldfarb, Nancy Nolan Colletti, of counsel), for appellee.

MODIFIED ON DENIAL OF REHEARING
Presiding Justice GREIMAN delivered the opinion of the court:
Defendant, Robert Allen, was convicted of the first degree murders of Andrew Horn and Michael Spencer, the latter under the theory of accountability, and was sentenced to a term of life imprisonment.
On appeal, defendant raises issues as to whether: (1) the State committed a discovery violation by not revealing to the defense either the contents of defendant's oral confession or a list of witnesses to the alleged confession; (2) the trial court erred in concluding that defendant was not illegally detained without probable cause; (3) the trial court erred in denying defendant's motion to suppress certain statements by defendant; and (4) defendant was denied a fair trial where the State misstated the law of accountability during its closing argument.
For the reasons which follow, we affirm defendant's conviction as to the murder of Andrew Horn and reverse and remand for a new trial as to the murder of Michael Spencer.
*253 At noon on August 21, 1990, defendant, Maurice Fort, Andrew Horn, and Michael Spencer were present at Michael's house on 121st and Prarie Street. Maurice asked the others to help him rob a drug dealer called "Fish" later that night. The four agreed to meet at midnight on the corner of 122nd and Praire, where they would drive to the westside in search of Fish.
At 2 p.m. Maurice told defendant that the Fish robbery was a pretext to get Andrew and Michael to accompany them to the westside. Maurice mentioned that he planned to "set them up" in retaliation for their "stealing from his cousin."
The four met as planned and defendant drove Maurice's car in search of the fictitious Fish. In route, they stopped at defendant's grandmother's house at 1140 N. Hamlin, ostensibly to prepare for the robbery, parking in the alley behind the house. Preparation included removing their guns from the car's trunk.
Once there, all four exited the car. Maurice then drew a .38 automatic and told Andrew and Michael to lie face down on the ground. They complied. Maurice then said "first thing you all should learn is never to try to get someone to go against their own cousin." Maurice then shot Michael in the back. He then withdrew a second gun and handed it to defendant. Maurice then shot Michael again.
Defendant stated that he did not immediately shoot Andrew, but was encouraged to do so by Maurice, who gestured with the gun, "like come on; go ahead so we can get out of here." Defendant fired four shots, hitting Andrew with three.
After the shooting, Defendant and Maurice drove to 120th and Wentworth, where they left the car, going their separate ways. Defendant remained in a hotel room until the next morning. At 11 a.m., defendant was visited by Maurice and the two went to defendant's grandmother's house, where they spent the balance of the afternoon.
At 6:30 p.m., defendant and Maurice learned that Andrew's brother suspected their involvement in the killings. Defendant then drove Maurice's car to Milwaukee, where he had a girlfriend and a son.
While in Milwaukee, defendant became ill with food poisoning and aggravation of a preexisting asthma condition and was admitted to St. Joseph's Hospital in Milwaukee, where he remained for five days; registering under an assumed name.
Detective Gene Harris of the Chicago Police Department was assigned to investigate the deaths of Michael and Andrew and learned that both Andrew and Michael had left the neighborhood the previous night with defendant and Maurice to rob a dope dealer on the westside.
Defendant and Maurice were known to Detective Harris, and in fact Harris was already looking for them as witnesses to an unrelated homicide. Harris contacted defendant's mother, who in turn contacted defendant in Milwaukee and instructed him to call Harris at Area 4 Police Headquarters.
On August 25, 1990, defendant called Harris to tell him he was hospitalized in Milwaukee. During that conversation, defendant told Harris that he would contact him upon his release from the hospital. The following morning, Harris received another call from defendant. Defendant told Harris that he would probably be released from the hospital later that day.
Harris testified that defendant accepted his offer to pick him up from the hospital and drive him back to Chicago. Harris claims this arrangement was due to the fact defendant did not have another way back to Chicago.
Harris and another detective left for Milwaukee at 10 a.m. on August 26, 1990, driving an unmarked police car. Upon arriving at St. Joseph's, Harris waited approximately one hour for defendant to be discharged. Defendant was given a prescription for both the stomach condition and asthma.
On leaving the hospital, defendant was not handcuffed, and was given no indication of formal arrest. On the drive to Chicago, defendant and Harris spoke only generally about the two cases in which they were involved.
*254 The detectives stopped at an A & W restaurant where defendant used the bathroom while Harris ordered food. Upon arriving at Area 4 around 4 p.m., Harris placed defendant in an interview room and read and received waiver of his Miranda rights. Harris questioned defendant for approximately one hour. According to Harris' trial testimony, which was the subject of multiple motions for mistrial based upon a violation of the discovery rules, defendant admitted to having prior knowledge of Maurice's plan to kill Michael and Andrew.
Defendant further admitted the killings were on behalf of Tyrone Morris, in retaliation for Michael and Andrew interfering in his drug business. Harris did not memorialize these admissions, nor were they explicitly reflected in the official police report, which was prepared by Harris' partner, Detective Freed.
At Harris' request, Assistant State's Attorney Laura Morask arrived at Area 4 around 9:30 p.m., and after witnessing defendant take his medication, which had been obtained by Harris, she Mirandized him and began questioning. Soon into the interview, Assistant State's Attorney Morask summoned a court reporter to take defendant's statement. Once on record, and after Morask again read defendant his constitutional rights, the following colloquy occurred:
"Q: Understanding these rights, do you wish to talk to us now?
A: No.
Q: You don't want to talk?
A: Yes, I will talk.
Q: Do you want to talk to us after I read you those rights?
A: Yes, I want to talk to you now."
The statement continued and defendant admitted the following: (1) At 2 p.m. on the day of the murders, Maurice was "kind of like mentioning" that something would be done to Michael and Andrew; and (2) That Maurice told him Michael and Andrew "kept on stealing from his cousin; and he was taking them out west supposedly to stick-up some dude named Fish, but it would be the other way around. Have somebody set them up, Michael and Andrew."
Defendant was convicted of the first degree murders of Andrew and Michael, the latter under the law of accountability. 720 ILCS 5/5-2(c).
Defendant first contends the State's failure to disclose the substance of defendant's oral confession prior to trial was a discovery violation so prejudicial so as to require reversal of defendant's conviction for the murder of Michael Spencer.
Supreme Court Rule 412(a)(ii) provides in part that the State must reveal to the defense prior to trial:
"any written or recorded statement and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgement of such statements." (134 Ill.2d R. 412(a)(ii).)
725 ILCS 5/114-10 provides:
"(a) On motion of a defendant in any criminal case made prior to trial the court shall order the State to furnish the defendant with a copy of any written confession made to any law enforcement officer of this State ... and a list of witnesses to its making and acknowledgement. If the defendant has made an oral confession a list of witnesses to its making shall be furnished. (c) No such confession shall be received in evidence which has not been furnished in compliance with subsection (a) of this Section unless the court is satisfied that the prosecutor was unaware of the existence of such a confession prior to trial and that the prosecutor could not have become aware of such in the exercise of due diligence." (725 ILCS 5/114-10, (West, 1992).)
Illinois courts have consistently held that the State must tender to the defense, upon request, the substance of any oral statements made by the accused. (People v. Miles (1980), 82 Ill.App.3d 922, 38 Ill.Dec. 356, 403 N.E.2d 587). The State is not required to make a transcript or memorandum of the defendant's oral statement, but must disclose the substance of that oral statement. (People v. Wielgos (1991), 220 *255 Ill.App.3d 812, 163 Ill.Dec. 347, 581 N.E.2d 298). The rule is mandatory, and compliance is excused only when the State, by the exercise of due diligence, could not have learned of the defendant's statement before trial. People v. Chriswell (1985), 133 Ill.App.3d 458, 88 Ill.Dec. 568, 478 N.E.2d 1176.
In the present case, the defense made the appropriate written demand for any oral statements made by defendant. The State answered that "all memoranda reporting or summarizing oral statements made by witnesses are contained in the police report tendered to the defense in open court." As noted earlier, the police report does not reflect statements Detective Harris attributed to the defendant in his testimony.
The trial court found that the court-reported statement submitted by the State essentially conveyed the substance of defendant's oral confession to Detective Harris, effectively eliminating unfair surprise and prejudice to defendant.
However, the record clearly demonstrates that the court-reported statement does not substantially convey the substance of the unrecorded oral statement. The court-reported reveals the following:
"Q: Now, at that time did Maurice say anything about sticking-up Michael and Andrew?
A: No, he didn't.
Q: Did you have any idea that may happen?
A: Well, later in the day he was kind of like mentioning it.
Q: What did he mention later in the day?
A: They kept on steal from his cousin; and he was taking them out west and supposedly to stick-up some dude named Fish, but it would be the other way around. Have somebody set them up, Michael and Andrew."
Detective Harris testified that in the prior unrecorded statement defendant admitted that he and Maurice planned the murders because Michael and Andrew had robbed Tyrone Morris' drug houses; and that they were later paid by Tyrone Morris for the murders.
The court-reported confession indicates that defendant had prior knowledge that the victims were being set-up, yet that statement refers to their being set-up for robbery. Also, the court-reported statement makes no mention of defendant's drug involvement. Conversely, the oral confession places defendant directly in the plan to murder Michael and Andrew for drug related reasons.
The two statements are not reconcilable, and the State's failure to disclose the substance of the oral statement until the third day of trial is a clear discovery violation. The State's claim that it became aware of defendant's oral confession on the third day of trial is somewhat incredible, suggesting that in the exercise of due diligence they were unable to discover the oral confession to Detective Harris that defendant conspired to commit a for profit drug murder.
The fact the court reported statement does not reflect the far more damaging admissions contained in the prior oral confession is inexplicable. Even excusing this conundrum, there can be no corollary excuse for the State's decided lack of diligence in failing to disclose the substance of the oral confession prior to trial.
The State argues that even if a discovery violation occurred, defendant failed to show he was prejudiced by the violation. When undisclosed testimony is at issue, a trial court has discretion to allow its introduction where there is no showing of surprise or prejudice. People v. Jackson (1986), 145 Ill.App.3d 626, 99 Ill.Dec. 472, 495 N.E.2d 1207.
In determining prejudice, the following factors are relevant: (1) the strength of the undisclosed evidence, (2) the likelihood that prior notice could have helped the defense discredit the evidence, (3) the feasibility of a continuance rather than a more drastic sanction, and (4) the wilfulness of the State in failing to disclose. People v. Weaver (1982), 92 Ill.2d 545, 65 Ill.Dec. 944, 950, 442 N.E.2d 255, 261.
Detective Harris' testimony to defendant's oral confession significantly strengthens the State's theory of accountability as to Michael, as well as introducing the highly prejudicial *256 element of drug involvement. The sole viable defense available to defendant under the law of accountability was a showing that he was unaware of Maurice's plan to kill Michael and Andrew. The undisclosed evidence that defendant not only knew but planned the murders is fatal to this defense. It is difficult to imagine a more prejudicial result.
Where the strength of the undisclosed evidence is powerful, a conviction will be reversed where the State failed to disclose either the contents of, or witness list to, a confession made to a police officer which did not appear in any police report. People v. Agyei (1992), 232 Ill.App.3d 546, 173 Ill.Dec. 722, 597 N.E.2d 696.
The State further argues that any prejudice to defendant was remedied by the trial court's limiting the testimony of Detective Harris to exclude reference to the fact defendant was involved in the plan to kill the victims. Yet Harris went on to testify to defendant's joining Maurice in a plan "to do" Michael and Andrew. Clearly, the trial court's limiting instruction was ignored, and the harm to defendant was therefore not remedied.
The State's failure to reveal the substance of the oral confession and the prejudice which this caused to the defendant requires us to reverse the conviction of defendant as to the murder of Michael Spencer and remand for a new trial.
Defendant next asserts that the trial court erred in denying his motion to quash arrest and suppress evidence because he was illegally detained without probable cause. Defendant argues that he was placed under arrest without probable cause when Detectives Harris and Thomas drove him from the Milwaukee hospital to Area 4 in Chicago, and therefore the statements given after the illegal detention should not have been admitted.
A person has been arrested when his freedom of movement has been restrained by means of physical force or show of authority. (People v. Melock (1992), 149 Ill.2d 423, 174 Ill.Dec. 857, 599 N.E.2d 941; citing United States v. Mendenhall (1980), 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497.) The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable person would conclude that he was free to leave. (People v. Eddmonds (1984), 101 Ill.2d 44, 77 Ill.Dec. 724, 461 N.E.2d 347.) Among the factors considered are the intent of the officer and the understanding of the suspect. People v. Wipfler (1977), 68 Ill.2d 158, 11 Ill.Dec. 262, 368 N.E.2d 870.
Harris testified that defendant voluntarily accepted his offer of a ride back to Chicago because defendant apparently had no alternate means of transportation. Defendant testified that he did not ask Harris for the ride, that he had a car in his possession, and a girlfriend present in the hospital.
A trial court's ruling on a motion to quash arrest will not be disturbed on review unless it is clearly erroneous. (People v. Holmes (1989), 198 Ill.App.3d 766, 144 Ill. Dec. 861, 556 N.E.2d 539.) The trial court, upon denying defendant's motion, explicitly noted that it was basing its ruling on the fact it found Harris' testimony more credible than that of defendant.
It is the proper function of the trial court at the suppression hearing to determine the credibility of the witnesses and to resolve conflicts in their testimony. (People v. Hobley (1994), 159 Ill.2d 272, 279, 202 Ill.Dec. 256, 637 N.E.2d 992; People v. Redd (1990), 135 Ill.2d 252, 289, 142 Ill.Dec. 802, 553 N.E.2d 316.) The evidence in support of defendant's claim depends almost exclusively on his own testimony, which the trial court chose not to believe. The record supports this finding, where defendant twice phoned Detective Harris while in Milwaukee, was not handcuffed or otherwise restrained when met by Detective Harris, and accompanied Detective Harris into the A & W where he was left alone while Harris ordered food for defendant and both detectives.
Additionally, upon arrival at Area 4, defendant was immediately placed in an unlocked interview room, allowed to see his mother, and questioned for a relatively short period of time. These factors are not indicative of arrest (see People v. Matthews (1990), 205 Ill.App.3d 371, 150 Ill.Dec. 310, 562 N.E.2d *257 1113), and we do not find the trial court's ruling manifestly erroneous.
Defendant also contends his Miranda rights were not scrupulously honored, and were therefore violated, when Assistant State's Attorney Morask asked a clarifying question after defendant answered "no" to the question "Understanding these rights, do you wish to talk to us now?"
Under Miranda and its progeny, once a suspect unambiguously states that he or she does not wish to be interrogated by law enforcement officials, that request must be "scrupulously honored" and all questioning must immediately cease. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
Defendant relies on two factually similar cases which support the proposition that a suspect's responsive "no" precludes even the most innocuous clarifying question from the State. In People v. Brown, the following colloquy occurred between an assistant State's Attorney and a 16-year-old suspect:
"Q. Understanding these rights do you wish to talk to us now?
A. No.
Q. Pardon me?
A. I didn't understand.
Q. Understanding these rights, do you wish to talk to us now?
A. Well, I already told you what happened.
Q. All right. After you told me before about what happened I informed you that I was going to call a court reporter and we were going to take it down in writing, is that correct?
A. Yes, sir.
Q. Now I've advised you of your rights. Understanding these rights do you wish to talk to us about the incident involved on the 30th of June, 1983 involving the shooting death of Renaldo Reyes?
A. Yes." (People v. Brown (1988), 171 Ill.App.3d 993, 121 Ill.Dec. 812, 817, 525 N.E.2d 1119, 1124.
A crucial difference between the above colloquy and that involved in the instant appeal is the Brown suspect's response, "[w]ell, I already told you what happened" to the repeated question "Understanding these rights, do you wish to talk to us now?" This indicates a degree of hesitancy absent in the present action, where defendant's response to the identical question was, "Yes, I will talk." In Brown, the questioner prodded the defendant into an affirmative answer.
The defendant relies further on People v. R.C., a case cited in Brown, where the supreme court reversed the conviction of a 15year-old defendant on similar grounds. (People v. R.C. (1985), 108 Ill.2d 349, 91 Ill.Dec. 606, 483 N.E.2d 1241.) People v. R.C. involved a 15-year-old defendant with an I.Q. under 80. Also, the colloquy between the defendant and the interviewing police officer was far more suggestive of a fifth amendment violation than that here at issue. In R.C., the defendant responded, explicitly, that he did not wish to speak to the police. The officer then told the defendant that a witness had already identified him as the perpetrator, clearly in an effort to encourage the defendant to confess. Again, the questioner prodded defendant into an affirmative response.
We are here presented with a 23-year-old defendant who, after initially responding "no" to the waiver question, immediately evidenced his intention to continue the questioning. Because of the distinctions between the precedent offered by defendant and the facts of this case, we find that defendant's Miranda rights have not been violated, and the confession was properly admitted by the trial court.
It is crucial that we recognize the bright line over which no police officer or State's Attorney may tread. However, in both Brown and R.C. there is the hint of argumentative advocacy that is missing in the colloquy between the assistant State's Attorney and the defendant in the case at bar. In the popular vernacular, we might ask, "What is there about "No" that you don't understand?" However, the assistant State's Attorney merely followed the "No" with "You don't want to talk" to ensure that defendant understood the question. Defendant immediately *258 and unequivocally made it clear that he wished to continue talking.
Lastly, defendant argues he was denied a fair trial because the State misstated the law of accountability in its closing argument. As a preliminary matter, the State argues that defendant failed to preserve this argument and it is waived on appeal. The defendant did, in fact, preserve this argument at trial in a motion for a new trial. Consequently, defendant has not waived this argument on appeal.
Though properly before this court, we are unpersuaded by defendant's argument. Both sides failed in their closing arguments to accurately state the law of accountability, and the trial court admonished the jury that arguments of the attorneys were not the law to be followed. Additionally, defense counsel read the proper accountability instruction to the jury, and the trial court gave the proper instruction to the jury prior to their deliberations.
Even where a prosecutor has misstated the law of accountability in closing argument, the error is not grounds for reversal where the jury was properly instructed. (People v. Underwood (1982), 108 Ill.App.3d 846, 64 Ill.Dec. 415, 439 N.E.2d 1080; People v. Blalock (1993), 239 Ill.App.3d 830, 180 Ill.Dec. 576, 607 N.E.2d 645.) Further, any error in this regard is harmless.
For the foregoing reasons, we affirm in part and reverse in part, and remand for a new trial on the charge of first degree murder in the death of Michael Spenser. As a consequence, we vacate the sentence of natural life, as to both convictions, and remand for resentencing.
RIZZI and TULLY, JJ., concur.