THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRED HALMON, Defendant-Appellant.
First District (5th Division)   No. 1—87—2423

Opinion filed February 7, 1992.

Rita A. Fry, Public Defender, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Jane Liechty Loeb, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

JUSTICE MURRAY delivered the opinion of the court:

Fred Halmon (Halmon), defendant, was charged, along with codefendants Leroy Mitchell and Ruben Young, with three counts of murder and attempted armed robbery in connection with the death of Joyce Partridge (Partridge), three counts of feticide in connection with the death of her unborn fetus, and the attempted murder and attempted robbery of Eugene Anderson. The defendants were tried separately after motions for severance were granted.

Following a trial before a jury, Halmon was found guilty of all charges. The trial court sentenced him to concurrent terms in the Illinois Department of Corrections of 80 years on the offense of murder, 20 years on attempted murder, 20 years on feticide, and 15 years on attempted armed robbery.

Halmon raises nine points in his appeal:

(1) Whether the trial court erred in denying the motions to quash arrest and suppress evidence where the State failed to prove that the police officers had probable cause to arrest Halmon at the time he was detained for custodial interrogation;

(2) Whether in basing its denial of the motions to suppress on matters outside the record, the trial court denied Halmon due process of law;

(3) Whether Halmon was proven guilty of murder beyond a reasonable doubt;

(4) Whether Halmon's conviction for feticide must be reversed where the State failed to prove beyond a reasonable doubt that he had knowledge of Partridge's pregnancy;

(5) Whether the jury instructions on feticide improperly allowed the jury to use "transferred intent" to satisfy the elements of the offense;

(6) Whether Halmon's conviction for attempted murder must be reversed because the State failed to prove that he had the requisite intent to kill Eugene Anderson;

(7) Whether Halmon's conviction for attempted armed robbery must be reversed where the State produced no evidence apart from his statement which corroborated that statement with regard to the attempted armed robbery;

(8) Whether Halmon should be granted a new sentencing hearing where his 80-year sentence for murder was based on the trial court's erroneous belief that Halmon was eligible for a sentence of life imprisonment; and

(9) Whether the trial court abused its discretion in sentencing Halmon to the maximum extended term of 80 years for murder.

FACTS

The evidence indicates on September 11, 1983, Eugene Anderson picked up his friend Joyce Partridge. After going out to pick up some food, Anderson and Partridge sat in Anderson's car and talked. Joyce was sitting in the front passenger seat.

Anderson's car was parked on the west side of Millard. Anderson noticed three young men pass by, walking north on Millard. The men stood about a half a block away and talked for some time. They then walked back south on Millard and out of sight.

Approximately 15 minutes later, while Anderson and Partridge were still in the car, Anderson heard a noise, like something hit the window. He saw a young man standing just off the curb with a baseball bat in his hand. This person hit the front of the window near the windshield. Anderson saw this person reach for the car door; he locked the door. The window was hit again, but did not break. The man carrying the bat was wearing a ski mask that covered his face, with the eyes out.

Anderson saw a second man standing on the sidewalk near the fence. This man was in regular clothing. He was not wearing a ski mask.

After Anderson tried to start the car, he heard shots and glass breaking. He pulled away in the car. He asked Partridge if she was okay and did not receive an answer. He looked over, saw blood on the side of her face and drove to the hospital.

Partridge and her unborn fetus were pronounced dead at the hospital at approximately 4 a.m. on September 11, 1983.

Anderson returned to the scene of the incident with the police. At the scene, Officer Keane observed broken glass near the curb and on the street. The officer also found two .22 caliber brass casings on the sidewalk in front of 1444 South Millard.

Later that day, Anderson gave the police a description of the assailants' clothing. One of the individuals had on a light brown T-shirt. Anderson also told the police he thought he had seen one of the assailants reach into his waistband and pull out a handgun before the shots were fired; however, he denied this comment at trial.

In October 1985 Detectives Switski and Vucko conducted a lineup for Eugene Anderson. The five people in the lineup included Halmon, Leroy Mitchell and Ruben Young. Anderson was unable to identify anyone in the lineup.

Detectives Switski, O'Conner and Vucko testified at trial in a manner consistent with their testimony at the pretrial motions. That testimony and any discrepancies are discussed subsequently in this opinion.

At approximately 10:15 p.m. on October 3, 1985, Assistant State's Attorney Michael Kelly took a court-reported statement from Halmon. After the statement was transcribed, the assistant State's Attorney reviewed the statement with Halmon and allowed him to make corrections. At trial, at the completion of Assistant State's Attorney Kelly's testimony, the court-reported statement taken from Halmon was admitted into evidence and published to the jury.

Dr. Stein, the chief medical examiner for Cook County, performed autopsies on Joyce Partridge and her unborn fetus. In his opinion, Joyce Partridge died as a result of a bullet wound to the left side of the head which involved the brain and the fetus died for a lack of oxygen as a result of the death of the mother.

The jury found Halmon guilty of murder, feticide, attempted murder and attempted armed robbery.

Following return of the verdict, a two-stage death penalty hearing was held. The jury determined that Halmon should not be sentenced to death. The trial court sentenced Halmon to concurrent terms of incarceration of 80 years for murder, 20 years for attempted murder, 20 years for feticide, and 15 years for attempted armed robbery.

### MOTION TO QUASH ARREST

Prior to trial Halmon moved to quash his arrest and suppress his statements on the ground that the police officers who arrested him did so without a valid arrest warrant and without probable cause to believe he had committed a crime. The codefendants also raised the lack of probable cause at the time of their arrests, and a joint hearing was held on all three defendants' motions.

Patty Kelly testified on behalf of the State. In August and September of 1985 she was the program coordinator of the Chicago Crime Commission to Report Crime Hotline (Crime Commission). The hotline is a 24-hour telephone line, which is answered in person or by an answering machine. The information from the answering machine is recorded into a notebook, and then the tape is erased.

The Crime Commission received three anonymous calls regarding Freddy, Leroy and "Maine" or "Black Maine." The first call came into the Crime Commission on August 26, 1985, and was answered by the answering machine. The caller said a pregnant woman was stabbed and killed on a stairway. The suspects were brothers, named

Freddy and Leroy Harvey, who lived with their mother at 1433 South Millard. They were both wearing ski masks.

Miss Kelly called the police at Area Four and gave them the information the Crime Commission received. She was told there was insufficient information for the police to act.

The second phone call came in on September 23, 1985; this call was also answered by machine. This message concerned a lady being shot, and gave 1433 South Millard, first floor, as the suspect's address. The police were not contacted after this call.

The third call was on September 25, 1985. Miss Kelly answered the call. She was given three physical descriptions. "Freddy" was described as: "Black male, dark complected, five foot, 140 pounds, husky build, curls, some facial hair, early 20's." The caller gave the suspect's address as first floor, maroon and white building, 1433 Millard, and the date of the incident as October 12, 1983.

Miss Kelly described the caller as male, younger and black. She was never given a name. The caller did not identify who told him what and did not say when he received this information. He said he overheard or was given the information directly by these three individuals.

After the last call, Miss Kelly put the notes of the three calls together and forwarded the information to Detective McCarthy at Area Four violent crimes. She submitted the information as the chain of events occurred and included the discrepancies between the various calls. She was told that the police would look for three gang members that fit the description.

On September 30, 1985, Officer Thomas McCarthy, assigned to Area Four Violent Crimes, was contacted by Patty Kelly of the Chicago Crime Commission. She gave him some information about a shooting which involved a female victim. The crime occurred in September or October of 1985 (1983), in the area of 15th and Millard, between 2 a.m. and 3 a.m. She gave him the general descriptions of three people, the names Freddy, Leroy and Black Maine and an address of 1433 South Millard. Ms. Kelly would not divulge the source of this information or how that person knew the information she relayed to the police.

Officer McCarthy then reviewed the homicide data sheets looking for a case with the same basic facts. He found the Joyce Partridge homicide case. The original case reports in the file indicated there were only two offenders. After reviewing the file, he gave his notes and the file to the sergeant working the afternoon shift.

Detectives Ralph Vucko and Victor Switski were assigned to the investigation of the Partridge homicide on September 30, 1985. At that time, they received the information from the Crime Commission in note form. Neither detective personally contacted the Crime Commission regarding this information.

Detective Vucko reviewed the police reports. The "beat report" described the offenders by their clothing and as two black males. There were no ages, heights, weights, or names contained in that report.

The supplemental reports in the case described the number one suspect, the one with the ski mask, as: male black, 16 to 18 years of age, 5 feet 6 inches, 140 pounds. The alleged shooter was described as: male black, 17 to 18 years of age, 5 feet 4 inches to 5 feet 5 inches.

After reviewing the reports, Detective Vucko and his partner, Victor Switski, then went to 1433 South Millard. At the first-floor apartment, they asked what the last name was; they were told "Halmon."

On October 2, 1985, the detectives went to 1400 South Millard, where they found Leroy Mitchell (Mitchell). Mitchell was standing in front of 1447 South Millard, talking to his sister, at 6:30 p.m. when two plainclothes officers approached and asked his name. After Mitchell gave them his name and identification, they told him to get in the car and then drove to the police station.

At the police station, the detectives questioned Mitchell about a September 1983 murder. He denied knowing anything about it. They also asked him about Freddy Halmon; Leroy Mitchell said he did not know where he could be found. According to Detectives Vucko and Switski, Mitchell told them where they could locate Halmon. The detectives then drove to Douglas and Millard, where they located Halmon.

At some time prior to stopping Halmon, Detective Switski obtained his photograph. After placing Halmon's picture with three or four others, he took the array to the home of Anderson, the only eyewitness to the occurrence. Anderson was shown the array of photographs and was unable to identify anyone.

Halmon testified on his own behalf at the motion to suppress. On October 2, 1985, Halmon was living at 1948 West 19th Street. Between 7 and 7:30 p.m., he was walking down 14th Street and Millard on the way to visit his mother at 1433 South Millard. Halmon was approached by two plainclothes officers who jumped out of a blue unmarked car. The officers asked his name and patted him down. After

he identified himself, Halmon was told to get in the car. The officers pushed him into the car by force.

When he was stopped on the street, Halmon was not informed of the nature of the investigation or of any charges against him. He did not tell the officers he was willing to assist in their investigation. The officers told him to get in the car; Halmon asked them what the charge was and told them he did not want to go to the police station.

The trial court denied Halmon's motion to quash arrest and suppress evidence, finding that he had voluntarily accompanied the officers to the police station. The trial judge found that the arrest and investigation were conducted in a professional and logical manner; however, the trial court made no specific finding as to the time of Halmon's arrest or whether the police officers had probable cause for the arrest at that point in time. Additionally, the trial court made no specific findings as to the credibility of any of the witnesses.

Halmon contends that he was seized in violation of his fourth amendment rights on October 2, 1985. He argues that the anonymous calls to the Crime Commission and additional information available to the police including the statement of a cooffender were not sufficient cause to arrest him.

In the myriad of cases before this court on the subject, whenever an arrest is made without a warrant, the State argues probable cause. If the State is doubtful as to whether its probable cause argument will stick, it argues the seizure was a consensual one, i.e., the defendant consented to the police (statements given by a defendant under the consensual detention are not affected by the exclusionary rule). If that fails, the State argues that the evidence obtained is unattenuated by the illegal arrest. The State makes all three arguments in this case, and each argument is somewhat supported by case law.

The State's brief maintains, "The court then concluded that probable cause to arrest Halmon and co-offender Young was established at about 11:00 p.m. on October 2, 1985 when Mitchell gave an account of Halmon's and Young's participation in the offense." The relevant portion of the trial court's ruling is as follows:

> "In the same spirit, the defendant Mitchell volunteered to take a polygraph test. Undoubtedly the remoteness of the criminal incident encouraged the two defendants in this matter. Later at the district station when the defendant Mitchell orally gave a full account of what the three defendants had done in connection with the criminal incident which indicated his limited participation of the three defendants, the officers at that

point had complete probable cause to arrest the defendant, Ruben Young, who was arrested at about 11:00 p.m. that evening.

The court therefore finds that the arrests, the investigation of the criminal incident here was conducted in a professional and logical manner and that the defendants Mitchell and Halmon cooperated with the police officers, and that in the course of doing so, the probable cause to establish or the arrest of defendant Young. Motion to Quash Arrests and Suppress therefore are [sic] denied."

The trial court made a finding that "the officers at that point had complete probable cause to arrest the defendant, Ruben Young, who was arrested at about 11:00 p.m. that evening." The trial court did not make any finding as to when probable cause existed to arrest Halmon, or when Halmon was in fact under arrest; rather, the trial court found that. "Halmon cooperated with the police officers."

The fourth amendment of the United States Constitution provides that all persons are protected against unreasonable searches and seizures. An individual's fourth amendment rights are violated where he is seized and questioned while in custody on less than probable cause. (*People v. Vega* (1990), 203 Ill. App. 3d 33, 41, 560 N.E.2d 983, citing *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) When no "seizure" occurs, no fourth amendment rights have been infringed. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.) The test for whether a person has been seized within the meaning of the fourth amendment is whether, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. (*Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975; *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) The test is intentionally imprecise because it focuses on the coercive effect of police conduct taken as a whole, and not on each particular detail of the police conduct taken in isolation. *Michigan v. Chesternut* (1988), 486 U.S. 567, 100 L. Ed. 2d 565, 108 S. Ct. 1975.

The "exclusionary rule" is the remedy used to correct fourth amendment violations at a criminal trial. The exclusionary rule provides for the suppression of evidence at a judicial proceeding when the evidence, although probative, has been obtained in violation of a defendant's right to be free from unreasonable searches and seizures. (*Mapp v. Ohio* (1961), 367 U.S. 643, 6 L. Ed. 2d 1081, 81 S. Ct. 1684.) In reviewing a circuit court's determination on a motion to suppress, the reviewing court may also consider evidence adduced at trial. *People v. Caballero* (1984), 102 Ill. 2d 23, 36, 464 N.E.2d 223.

## A. CONSENT

In *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296, the police located defendants at or near their homes and brought them to the station for interrogation about their involvement in a murder. A police officer testified that defendants were "taken into custody" at that time. The arrest reports showed that between 1 p.m. and 3 p.m. and the defendants' home addresses were the times and places of arrest. While at the station, defendants were not told they were free to leave. Each defendant was left in an interrogation room and simply told that the officers would "get back to him." This court held that this added to a reasonable belief that defendants were under arrest. (*Avery*, 180 Ill. App. 3d at 153.) Defendants were kept in interrogation rooms for 8 and 10 hours. They were left alone for hours at a time. In the meanwhile officers continued the investigatory process. Defendants were questioned intermittently until they finally made inculpatory statements. This court held that the trial court erred in finding that no arrest occurred when defendants were first taken to the police station and that the show of official authority was such that a reasonable person would not have believed he was free to leave. *Avery*, 180 Ill. App. 3d at 153.

■ Halmon was in custody for approximately 32 hours. The time Halmon was at the police station spanned three shifts. Mitchell gave a statement implicating Halmon after approximately three hours. Mitchell did not implicate himself in that statement. Halmon was placed in a lineup after he was in custody for approximately four hours. During the time Halmon was at the police station, he was allowed to use the washroom; he was escorted by an officer. Halmon was fed; on two occasions a baloney sandwich was brought up from lockup. Halmon was also allowed to sleep; he had the opportunity to sleep in the interrogation room. The officers testified that at no time did they indicate to Halmon that Mitchell had implicated him in the incident. Halmon testified that he was handcuffed during the time he was in custody. Each of the officers testified that he was not. However, Halmon also maintains that he was left in a locked interrogation room. This testimony was corroborated by Detective O'Conner, who stated, "None of the three suspects were handcuffed. They were in locked rooms." Detective Switski testified that Halmon was free to leave, yet there is no indication that that right was ever communicated to Halmon. Moreover, a police officer's subjective belief that defendants were free to leave is not determinative where it was not communicated to defendant. *People v. Avery* (1989), 180 Ill. App. 3d 146, 154, 534 N.E.2d

1296, citing *United States v. Mendenhall* (1980), 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870.

Nothing in the record suggests that the officers told Halmon he was free to go; nor does the record suggest that Halmon asked to go. However, being stuck in an interview room in a police station for over three hours and not being told or indicated that one is free to leave would militate against a reasonable person's belief that he was free to leave the station, particularly when he did not know he was in fact under arrest until eight hours later. See *People v. Avery* (1989), 180 Ill. App. 3d 146, 534 N.E.2d 1296.

> "The determination of whether an interrogation is custodial should focus on all of the circumstances surrounding the questioning, such as: the location, length, mood and mode of the interrogation; the number of police officers present; any indicia of formal arrest or evidence of restraint; the intentions of the officers; and the extent of knowledge of the officers and the focus of their investigation. [Citation.] The trial court must examine and weigh these factors, along with the credibility of the witnesses. It then must make an objective determination as to what a reasonable man, innocent of any crime, would perceive if he were in defendant's position. [Citation.]" *People v. Brown* (1990), 136 Ill. 2d 116, 124-25, 554 N.E.2d 216.

The State argues that a reasonable person would not have considered himself under arrest from 7:30 to 10:15 p.m. on October 2, 1985. The State claims that during the pertinent time, defendant was left alone and not questioned by police officers. Referring to a 12:30 a.m. conversation, the State maintains:

> "There is no indication that defendant was given *Miranda* rights at all prior to that time. According to defendant's testimony, he was not given his rights at all until the State's Attorney came late in the day on October 3, 1985. Indeed, this Court can infer the rights were not given to defendant when he was first brought to the station because, as previously indicated, no conversation took place at that time *** ."

Halmon maintains the first time he was given *Miranda* warnings was when the State's Attorney interviewed him; however, a review of the record discloses that Detective Vucko testified to the contrary. Detective Vucko stated that Halmon accompanied him and Detective Switski to the police station at approximately 7:30 p.m. on October 2, 1985. At the station, they went to an interview room where "Halmon was informed of his Constitutional rights." They had a 5- to 10-min-

ute conversation. Vucko testified that the next time he saw Halmon was for 10 to 15 minutes at approximately 11:30 p.m.

The State cites the case of *People v. Holmes* (1989), 198 Ill. App. 3d 766, 556 N.E.2d 539, in which the court determined that the defendant was not under arrest despite the fact that the defendant had been at the station for almost four hours and had been questioned on two occasions for about an hour each, after being given *Miranda* warnings. The court noted that the defendant was given freedom of movement while at the station. (*Holmes*, 198 Ill. App. 3d at 775, 556 N.E.2d at 546.) The State asserts that "Halmon was only at the station for about 3 hours when police obtained probable cause for his arrest, and, during this time he was not Mirandized or questioned." We disagree with the State's assertion. Detective O'Conner's testimony supports Halmon's contention that he did not have freedom of movement, but rather was in a locked interrogation room and, further, Detective Vucko testified that he gave Halmon *Miranda* warnings when he arrived at the station.

The State maintains that "Halmon voluntarily accompanied police officers to the station. Thereafter, defendant remained voluntarily at the station while the officers, leaving Halmon alone, continued their investigation, primarily questioning Leroy Mitchell." Recently, in *People v. Walls* (1991), 220 Ill. App. 3d 564, 579, 581 N.E.2d 264, this court rejected the State's assertion of consent, observing:

"[W]e cannot condone the infringement of constitutional rights and find it difficult to believe, as the State must necessarily contend, that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest."

We find that the trial court's ruling on the motion to quash arrest was manifestly erroneous. Based on a review of the record in this case, we cannot find that a reasonable person would have felt that he was free to leave, nor can we find it reasonable to believe that Halmon consented to remain in a locked interrogation room while the police continued their investigation. We find that a reasonable person would not have believed he was free to leave under the circumstances.

### B. PROBABLE CAUSE

The State maintains that the trial court correctly held that the police officers had probable cause to arrest defendant Halmon three hours after his arrival at the station. As stated above we do not find that the trial court made this determination; however, that does not

preclude our addressing the issue whether the State had probable cause to arrest at approximately 11 p.m. on October 2, 1985, when Mitchell implicated Halmon.

Halmon contends that probable cause was lacking because Mitchell's statement was unreliable and that Mitchell's statement was not offered into evidence against Halmon. Alternatively, the State asserts that Mitchell's statement was offered into evidence against Halmon. Although we are unable to determine the significance of the trial court's reasoning, the trial court did not allow the statement during the testimony of one of the officers, but nevertheless did allow the statement during the subsequent testimony of another officer.

When Detective Vucko was testifying as to Mitchell's 10 p.m. statement, the trial court allowed the statement to establish probable cause to pick up Ruben Young. The trial court sustained Halmon's counsel's objection that the statement not be offered as to Halmon. However, during the testimony of Detective Switski the trial court denied the same objection. Detective Switski testified:

> "He [Mitchell] stated that on the night of the murder that he had been with Freddy Halmon and Black Maine and that Maine and Halmon had discussed robbing a couple who were sitting in a car parked right in the corner of 15th and Halmon [*sic*], 15th and Millard.
>
> He says that he stayed a short time, then he left and they left him with the idea that they were going to rob these people."

Information from a suspect which implicates another may provide sufficient grounds for probable cause where the information is buttressed by corroborating evidence. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998.) The State relies on *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998, and *People v. Dale* (1989), 189 Ill. App. 3d 704, 545 N.E.2d 521, to support its position that Mitchell's statement was sufficiently reliable. However, in both cases the court noted that the suspect was not absolved of liability by the statement implicating the codefendants.

The State also cites *People v. Johnson* (1989), 187 Ill. App. 3d 756, 544 N.E.2d 392, stating, "Noticeably absent from the recited facts is any indication that [defendant] implicated himself in any fashion." In that case the court concluded that the defendant's information provided sufficient ground for probable cause because it was buttressed by corroborating evidence. The court noted the defendant's connection to the scene: the defendant's statement was corroborated by physical evidence in police possession prior to the codefendant's ar-

rest; the defendant was found with the victim's truck; and the defendant was wearing the victim's vest.

■ In the present case the statement given by Mitchell three to four hours after Halmon arrived at the police station did not implicate Mitchell in the incident. Mitchell claimed to have overheard a conversation and left the scene before anything happened. We cannot find that his statement was presumptively reliable. Thus, the State did not have probable cause to arrest Halmon at the time of Mitchell's statement. Moreover, we believe that Halmon was arrested when he was placed in a locked interrogation room at 7:30 p.m. on October 2, 1985.

### C. ANONYMOUS TIP

Alternatively, the State submits should this court determine that the defendant's arrest occurred earlier, prior to Mitchell's implicating statement, the tip and information known earlier were alone sufficient to establish probable cause.

In the present case not only did the caller remain anonymous, but the information was relayed by a third party to the police. No testimony was offered as to the background or any credentials of the informant. There was no means to determine the informant's veracity or reliability. The informant left two messages on an answering machine and spoke with Patty Kelly once for 10 minutes. Patty Kelly reduced these calls to note form. She called the police and spoke with Officer McCarthy. Officer McCarthy gave his notes to the sergeant on duty at the time. Detectives Vucko and Switski were assigned to the case when they came on duty; they were also the arresting officers.

In several cases the Illinois Supreme Court has established general guidelines for the determination of exigent circumstances. The circumstances must " 'militate [ ] against delay and justif[y] the officers' decision to proceed without a warrant.' " (*People v. White* (1987), 117 Ill. 2d 194, 216, 512 N.E.2d 677, quoting *People v. Abney* (1980), 81 Ill. 2d 159, 168-69, 407 N.E.2d 543.) Some, but not all, of the factors to be considered are: (1) whether the offense has been committed recently (*People v. Abney* (1980), 81 Ill. 2d 159, 169, 407 N.E.2d 543); (2) whether there was a deliberate or unjustified delay by the police during which time a warrant could have been obtained (*Abney*, 81 Ill. 2d at 170-71); (3) whether a grave offense is involved, particularly a crime of violence (*People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369); (4) whether the suspect is reasonably believed to be armed (*Yates*, 98 Ill. 2d at 515); (5) whether the police where acting upon a clear showing of probable cause (*Yates*, 98 Ill. 2d at

515); and (6) whether there is a likelihood that the suspect will escape if not swiftly apprehended (*Yates*, 98 Ill. 2d at 515).

A trial court making a probable-cause determination when a police officer has proceeded without a warrant to search, seize evidence, or arrest a person is to apply standards at least as stringent as those that guide a magistrate in deciding whether to issue a warrant. (*People v. Adams* (1989), 131 Ill. 2d 387, 398, 546 N.E.2d 561, 566.) In determining whether officers who acted without a warrant had probable cause to arrest, the review must focus both on the information available to the officers at the time of the arrest and on the question of whether reasonable persons in their position would have believed that a crime was or had been committed. *Adams*, 131 Ill. 2d at 398, 546 N.E.2d at 566.

> "A police officer need not have observed personally the facts that he presents to a magistrate making a probable-cause determination. The officer's statements may be based on hearsay, and frequently such hearsay statements originate with an informant's tip. If facts supplied in a particular tip are essential to a finding of probable cause, the tip must meet standards of reliability before the magistrate may consider it in his determination." (*People v. Tisler* (1984), 103 Ill. 2d 226, 237, 469 N.E.2d 147, 153.)

An informant's veracity, reliability, and basis of knowledge are highly relevant factors to be considered in the determination of probable cause. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) The proper inquiry is whether or not a consideration of the totality of the circumstances demonstrates that probable cause exists based upon an informant's tip. *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317; *People v. Tisler* (1984), 103 Ill. 2d 226, 239, 469 N.E.2d 147.

The State was unable to present any testimony as to the informant's background, his criminal history, if any, or whether he had supplied the police with reliable information on any previous occasion. See *People v. Thomas* (1975), 62 Ill. 2d 375, 382, 342 N.E.2d 383.

The State argues that the tip in the present case gave not only details of the crime itself, its date, time and location, but included specifics of ski masks, the victim's pregnancy, who the intended victim was, the lookout stature of one of the offenders and the descriptions of where to find the offenders. The State maintains that the police then confirmed descriptions, names and addresses. Halmon contends that probable cause was lacking because the anonymous tip

was not reliable, Mitchell's statement was not reliable, and the corroboration was too minimal to even contribute to the finding.

Halmon maintains that the information obtained from the anonymous caller was inaccurate in several respects: the first call referred to the stabbing of a pregnant woman on a stairway; Halmon's unrebutted testimony was that in September 1983 he lived at 444 West Van Buren and in 1985 he lived at 1948 West 19th Street; and the physical description given by the caller was inconsistent with previously given descriptions of the offenders. The State argues that four of the details defendant cites as inaccurate were actually substantially correct. The caller referred to Freddy and Leroy "Harvey" as brothers and Halmon's reported confession indicated that the two men were blood brothers. The defendants were not biological brothers, and Halmon's reported confession was more than 24 hours after Halmon went to the police station. The State presents no evidence that at the time Halmon went to the police station they were aware that Halmon and Mitchell considered themselves "blood brothers"; therefore, this information could not have corroborated the anonymous informant's tip.

Next the State argues that the name "Harvey" is certainly close to the name "Halmon." The steps the police took to corroborate that the "Harvey" brothers lived at 1433 Millard was to go to the address and learn that the last name of the resident was "Halmon." The State argues that Halmon was living with his mother at the time of the incident. Halmon argues that it is unrebutted that he was not living with his mother. The State in turn points out that at the death penalty hearing the defendant changed his earlier testimony to now state that he did indeed live with his mother in September 1983. Although the State is correct as to the defendant's subsequent testimony, the State does not present any evidence that the police officers had any knowledge that Halmon had been living with his mother in 1983 when they stopped him on October 2, 1985, rather, the testimony presented indicated that Mitchell told the officers that they could find Halmon in the area of Douglas and Millard.

The informant's initial call referred to the stabbing of a pregnant woman in a stairwell. During a subsequent call the informant corrected the information. The State argues that the reference to a stabbing in a stairway, although inaccurate, does not seriously question the reliability of the overall tip. The State asserts that, first, this information was corrected by the caller himself prior to the time the tip was transmitted in full to police and, second, that considering the many other details which were given and corroborated, these two in-

accurate points are all but lost. First, we note that Patty Kelly talked to the police after the first call and was told that she had insufficient information. Moreover, there is no indication as to why the informant gave conflicting accounts of the incident. Second, many of the other details were corroborated at some point during the investigation, but the police did not possess much of this information at the time Halmon was taken to the police station.

Additionally, prior to detaining Halmon, a photo array including a picture of him was shown to the only eyewitness to the incident. Anderson was unable to identify anyone.

The existence of probable cause to make an arrest does not depend on any hard set of legal rules. It depends on whether the police acted reasonably under the circumstances. "Probable cause to arrest exists where the facts and circumstances within the officers' knowledge and of which they had a reasonable trustworthy information are sufficient to warrant a person of reasonable caution in the belief that a crime has been committed by the person being arrested." (*People v. Avery* (1989), 180 Ill. App. 3d 146, 154, 534 N.E.2d 1296, citing *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) Each case must be decided on its own facts. *People v. White* (1987), 117 Ill. 2d 194, 216, 512 N.E.2d 677.

■ Any of the listed inconsistencies or discrepancies by themselves are not sufficient to defeat a claim of probable cause; however, we find, looking at the totality of the circumstances, at the time the police officers brought Halmon to the police station they were not in possession of sufficient corroborating information to render the anonymous tip reliable.

For the above-stated reasons, we must find that the trial court's ruling was manifestly erroneous and that defendant was illegally detained without probable cause.

### MOTION TO SUPPRESS CONFESSION

An illegal arrest does not preclude the admission of a subsequently obtained confession which is not obtained by exploitation of the illegal arrest; and under these circumstances, to be admissible, the confession must be sufficiently an act of free will to purge the primary taint of the unlawful invasion. *People v. Foskey* (1990), 136 Ill. 2d 66, 85, 554 N.E.2d 192.

Under *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254, factors to be considered in determining whether a confession was the product of an illegal arrest are: (1) the proximity in time between the arrest and the confession, (2) the presence of inter-

vening circumstances, (3) the purpose and flagrancy of the police misconduct, and (4) whether *Miranda* warnings were given. (*Foskey,* 136 Ill. 2d at 85-86; *Brown v. Illinois* (1975), 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62; *White,* 117 Ill. 2d at 222.) Finally, the burden of showing redeeming attenuation as to evidence obtained through an illegal arrest rests upon the prosecution. *Foskey,* 136 Ill. 2d at 86; *White,* 117 Ill. 2d at 222.

■ The State's argument that Halmon's statements were a product of his free will and unaffected by any taint of illegality cannot be determined by this record. The trial court made no determination of the attenuation issue. The failure to address attenuation in the trial court is one result of the erroneous denial of the motion to quash and suppress. See *People v. Bates* (1991), 218 Ill. App. 3d 288, 297, 578 N.E.2d 240, 246-47.

In summary, the finding of the trial court denying defendants' motion to quash arrest is reversed, and the cause is remanded for a hearing as to whether there was sufficient attenuation to purge his confession from the taint of the earlier arrest. If the court finds there was sufficient attenuation to purge the statements from the taint of the earlier arrest, it is directed to reinstate the convictions in accordance with this opinion. If the court finds no such attenuation, it is directed to suppress the confession and to conduct further proceedings consistent with the views expressed herein. See *People v. Vega* (1990), 203 Ill. App. 3d 33, 560 N.E.2d 983.

### MURDER CONVICTION

Halmon argues that due to the lack of sufficient credible evidence, the State failed to prove him guilty of murder beyond a reasonable doubt. The standard in Illinois for reviewing a challenge based on the sufficiency of evidence to support a criminal conviction is whether after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 461.) The Illinois Supreme Court in *Young* articulated:

> "It is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony and the inferences to be drawn from the evidence. [Citations.] It is also peculiarly within the province of the jury to resolve any conflicts in the evidence. [Citations.] This court therefore will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses [citations] and will not reverse a criminal

conviction unless the evidence is so unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt. [Citations.]" (Emphasis omitted.) *Young,* 128 Ill. 2d at 51, 538 N.E.2d at 473-74.

A voluntary confession is of convincing character and constitutes the highest and most damaging type of evidence known to law. (*People v. Byrd* (1961), 21 Ill. 2d 114, 116, 171 N.E.2d 782, 783.) In his confession Halmon admitted that in an attempt to carry out a robbery plan he fired two shots into a parked car in which the victims, a male and a female, were sitting.

■■ The fact that Partridge was killed by the shots fired at her and Anderson is amply supported by not only the alleged tainted confession, but also by the uncontradicted details of the killing revealed at the trial which included pictures of the deceased taken after her death. Halmon points to discrepancies in the type of weapon, description of the offenders and the number of shots fired. Although there were discrepancies in the evidence, they affected the credibility of the witnesses, and it was peculiarly the function of the jury to weigh them. *People v. Thomas* (1991), 215 Ill. App. 3d 751, 576 N.E.2d 37.

After a review of the record, we find that there was sufficient credible evidence for the jury to find Halmon guilty of murder. If Halmon's confession is found to be free of the taint of the illegal arrest, we find that Halmon's conviction and sentence for murder must stand. However, if his confession is found to be tainted by the illegal arrest, Halmon is entitled to a new trial.

## FETICIDE

Under the feticide statute, the State was required to show that Halmon "knew, or reasonably should have known under all of the circumstances, that the mother [Partridge] was pregnant." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1.1(a)(4).) Halmon argues that his conviction for feticide should be reversed because the State failed to prove beyond a reasonable doubt that he had knowledge of Partridge's pregnancy.

"Circumstantial evidence is the proof of facts or circumstances which gives rise to a reasonable inference of other facts which tend to establish the guilt or innocence of a defendant." (*People v. Evans* (1981), 87 Ill. 2d 77, 83, 429 N.E.2d 520.) A conviction can be sustained upon circumstantial evidence, and to prove guilt beyond a reasonable doubt, a jury need not disregard the inferences that flow normally from the evidence before it. *People v. Shum* (1987), 117 Ill. 2d 317, 362, 512 N.E.2d 1183.

Partridge was about 7½ months pregnant at the time of her death. Two of the State's witnesses, Thomas Hayes and Eugene Anderson, testified that Partridge was "noticeably pregnant." Eugene Anderson testified that three men cased the car 20 minutes prior to the occurrence. Halmon's confession indicated that he stood six to seven feet away from the car when Mitchell hit the window with the bat.

■ The standard when reviewing a claim of insufficient evidence is, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49, 538 N.E.2d 461, 472-73.) Applying the aforementioned standard and viewing the evidence in a light most favorable to the prosecution, we find that the jury could have inferred from the evidence presented that Halmon had knowledge that Partridge was pregnant at the time he fired the shots into the car.

Defendant also contends that the jury instructions on feticide improperly allowed the jury to use "transferred intent" to satisfy the elements of the offense. Halmon requests that this court reverse his conviction for feticide and remand for a new trial.

The feticide statute in effect at the time of Halmon's trial and conviction provided:

"§9—1.1. Feticide. (a) A person commits the offense of feticide who causes the death of a fetus if, in performing the acts which caused the death, he without lawful justification:

(1) either intended to kill or do great bodily harm to the mother carrying the fetus or knew that such acts would cause death or great bodily harm to the mother; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the mother; or

(3) he was attempting or committing a forcible felony against the mother other than voluntary manslaughter; and

(4) he knew, or reasonably should have known under all of the circumstances that the mother was pregnant." Ill. Rev. Stat. 1983, ch. 38, par. 9—1.1 (repealed by Public Act 84—1414, eff. Sept. 19, 1986).

Halmon was convicted by a jury under the aforestated law which was in effect at the time. The feticide statute required that the State prove that Halmon intended to kill or do great bodily harm to Joyce Partridge and that he knew or reasonably should have known under all of the circumstances that Partridge was pregnant. His intent with

respect to the fetus or Joyce's unborn child was immaterial. Ill. Rev. Stat. 1983, ch. 38, par. 9—1.1.

The jury in this case was instructed as to the State's burden of proving the offense of feticide, as follows:

> "To sustain the charge of feticide, the State must prove the following:
>
>> One, that the Defendant performed the acts which caused the death of the fetus;
>>
>> Two, that when the Defendant did so, he intended to kill or do great bodily harm to Joyce Partridge *or another* or he knew that this act would cause death or great bodily harm to Joyce Partridge *or another*, or he knew that his acts created a strong probability of death or great bodily harm to Joyce Partridge *or another*; or he was attempting to commit the offense of armed robbery;
>>
>> Three, that he knew or reasonably should have known, under all the circumstances, that Joyce Partridge was pregnant; and
>>
>> Four, that the fetus was capable, at the time of its death, of sustained life outside of the mother's womb, with or without life support equipment.
>>
>> If you find, from your consideration of all the evidence, that each one of these propositions had been proved beyond a reasonable doubt, you should find the defendant guilty." (Emphasis added.)

■ In this case the judge instructed the jury, among other things, that if when Halmon killed Partridge, he intended to do great bodily harm to Partridge "or another" he was guilty of the crime of feticide. It is to this instruction that Halmon objects. Halmon is correct; the jury may have inferred that he intended to do great bodily harm to the "fetus" or to Anderson, rather than the mother, which is the crux of the required intent.

> "[F]eticide occurs only where the *requisite mens rea* is directed toward the mother and not when it is directed toward another, even the fetus." (Emphasis added.) *Shum*, 117 Ill. 2d at 360, 512 N.E.2d at 1200, citing Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a).

Although transferred intent is a well-recognized legal principle in Illinois criminal law, the principle did not apply to the now-abolished crime of feticide. In *People v. Shum* (1987), 117 Ill. 2d 317, 360, 512 N.E.2d 1183, 1200, the Illinois Supreme Court stated:

"The exclusion of transferred-intent cases from the feticide statute was a rational decision by the legislature."

Thus, in light of the Illinois Supreme Court's holding in *People v. Shum*, we must reverse the feticide conviction due to the erroneous instruction and remand for a new trial on the feticide issue. We note, shortly after Halmon's conviction, the legislature repealed the crime of feticide and created the crime of intentional homicide of an unborn child. Ill. Rev. Stat. 1989, ch. 38, par. 9—1.2.

### ATTEMPTED MURDER

Halmon claims his conviction for the attempted murder of Anderson must be reversed because the State failed to prove that he had the requisite intent to kill Anderson. We find this contention without merit.

A criminal conviction will not be reversed unless the evidence is so improbable or unconvincing that it creates a reasonable doubt of the defendant's guilt. (*People v. Trimble* (1991), 220 Ill. App. 3d 338, 580 N.E.2d 1209; *People v. Schorle* (1990), 206 Ill. App. 3d 748, 758, 565 N.E.2d 84, 90.) The relevant question when a conviction is challenged based upon the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) The Illinois Supreme Court stated in *People v. Mitchell*:

"In order to sustain a conviction for attempted murder, the prosecution must prove that the defendant had the intent to kill the victim. [Citations.] Admittedly, the specific intent to kill may be shown by circumstances, including the character of the assault upon the victim. [Citations.]" (*People v. Mitchell* (1984), 105 Ill. 2d 1, 9, 473 N.E.2d 1270.)

Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life. (*People v. Winters* (1986), 151 Ill. App. 3d 402, 405, 502 N.E.2d 841, citing *People v. Coolidge* (1963), 26 Ill. 2d 533, 537, 187 N.E.2d 694.) "The fact that a defendant fires a gun at a person supports the conclusion that said defendant did so with the intent to kill." *People v. Wilson* (1991), 224 Ill. App. 3d 364, 367, citing *People v. Thorns* (1978), 62 Ill. App. 3d 1028, 1031, 379 N.E.2d 641, 643.

■ It is the function of the trier of fact, the jury in the present case, to determine the existence of the requisite intent, and we cannot disturb that determination on review unless it clearly appears that a reasonable doubt as to the defendant's guilt exists. (*Winters*, 151 Ill. App. 3d at 406.) The facts show that Mitchell first struck the car window with a bat. Halmon was standing six or seven feet away and was aware that two people were sitting inside the car. Subsequently, Halmon fired two shots into the parked car.

Viewing the evidence in a light most favorable to the State, we find that the jury could have found beyond a reasonable doubt that Halmon had the requisite specific intent to kill Anderson.

### ARMED ROBBERY

Halmon argues that his conviction for attempted armed robbery must be reversed because the State failed to present sufficient evidence of the *corpus delicti* of that offense. Halmon contends that no other evidence, apart from his own confessions, tended to show that the offense of attempted armed robbery occurred. Halmon also makes the related argument that his 80-year sentence must also be vacated, because the attempted armed robbery conviction supplied the sole aggravating factor on which the jury was instructed.

A conviction for a criminal offense requires proof of the *corpus delicti*, *i.e.*, that a crime was committed, and proof that the defendant is the guilty party. (*People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427.) The *corpus delicti* cannot be established by the defendant's confession alone; there must either be some independent evidence or corroborating evidence outside of the confession which tends to establish that a crime occurred. (*People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427.) "If there is such evidence, and that evidence tends to prove that the offense occurred, then that evidence, if it corroborates the facts contained in the defendant's confession, may be considered together with the confession to establish the *corpus delicti*." *Lambert*, 104 Ill. 2d at 379.

The Illinois Supreme Court has stated:

"[I]f the independent evidence *tends* to prove that an offense occurred, then such evidence, if corroborative of the facts contained in the confession, may be considered along with the confession in establishing the *corpus delicti*. In such event, the independent evidence need not establish beyond a reasonable doubt that an offense did occur." (Emphasis in

original.) *People v. Willingham* (1982), 89 Ill. 2d 352, 361, 432 N.E.2d 861.

See also *People v. Howard* (1991), 147 Ill. 2d 103.

Recently, the Illinois Supreme Court in *People v. Howard* held that evidence corroborating the statement of an accused need not independently establish the offense beyond a reasonable doubt, but rather, it is sufficient if the corroborating evidence tends to show the commission of the offense. *People v. Howard*, 147 Ill. 2d at 128, citing *Willingham*, 89 Ill. 2d at 361.

The facts of *Howard* disclose the following. At approximately 4 a.m. decedent was shot as he sat in a parked car. A passenger in the car was unharmed. The passenger testified that while she and the decedent were sitting in the car talking, she saw a man approach the car from the opposite side of the street. The defendant approached the car and knocked on the driver's window. Decedent lowered the left rear window several inches and the defendant then asked for a light. The decedent responded, "No man, go ahead." The defendant stepped back five or six feet from the car, drew a gun, pointed the weapon at the driver and fired. Investigating officers found a shell casing from a 9-millimeter semiautomatic pistol at the scene of the shooting. After an arrest on an unrelated charge, and learning that he had been identified as the gunman, the defendant admitted responsibility for the shooting. The defendant told police that he had been walking around with a gun "looking for someone to rob." The defendant provided an oral confession to the crimes, after which he directed several police officers to the crime scene and reenacted his commission of the offenses. The defendant later made a formal statement in the presence of a court stenographer. At trial, defense counsel presented evidence contradicting several facts related in the defendant's oral and signed statements. The defendant argued that the evidence failed entirely to show the *corpus delicti* of the attempted armed robbery. He contended that the testimony and physical evidence introduced at trial showed only that a murder occurred and did not sufficiently corroborate the defendant's confession of the attempted armed robbery. The court held that the independent evidence introduced at trial was sufficiently corroborative of the defendant's confessions and that that evidence and the defendant's statements, combined, established the *corpus delicti* of the attempted armed robbery charge. *People v. Howard*, 147 Ill. 2d at 129.

Halmon's court-reported statement discloses the following. On September 11, 1983, at approximately 2 a.m., Halmon was on his

way to a party. At the party he saw Leroy Mitchell and Black Maine. Leroy Mitchell was his "Blood brother" who stayed at his mother's house "a lot." The three men left the party at the same time. They walked to 14th and Millard. While walking they saw a car with a female and a male sitting in it. The female was sitting in the passenger's side, and the male was sitting in the driver's seat. Halmon stated, "We was talking about sticking them up." The men went to Halmon's mother's house, where they went to the back porch. On the back porch they discussed how they were "going to stick them up." While they were on the porch they picked up a shotgun. Halmon stated that it was his shotgun. However, in response to a question as to whether it was a shotgun or a rifle, Halmon answered, "a rifle, twenty-two rifle." While at his mother's house, Halmon got black jackets for himself and Leroy as well as hats for all three men. He also got a baseball bat. Leroy Mitchell was in possession of the baseball bat. They left Halmon's mother's house and walked across the street to a vacant lot. Then they walked down an alley until they came to a gangway which led straight to the car. Halmon was standing six or seven feet from the front of the vehicle when Mitchell was hitting the driver's side window with a baseball bat. Leroy Mitchell went and "hits [sic] the window two times and it didn't bust." Halmon shot the rifle two times. The window broke on the first shot. The second shot went into the window after the window "busted." The car took off and the three men back-tracked to Halmon's mother's yard. They got rid of the clothes. Maine (Ruben Young) went home at that time. Mitchell and Halmon stayed at his mother's house for 40 minutes. Halmon went to his sister's house and "[l]ayed [sic] low for a week or two." About two weeks later Halmon went back and "got the twenty-two rifle and took it back south to 51st and Carpenter, *** layed [sic] it in the garbage can and asked [his cousin] did he know anybody that wanted to buy a twenty-two rifle." Halmon's cousin told him to go on the street to 51st and Carpenter, where they "buy pistols all day long." By the time Halmon walked around the block the rifle was sold.

Anderson testified that at the time of the incident, he was sitting in the driver's seat of the car and Partridge, a female, was sitting in the passenger seat. Approximately 20 minutes before the attack, three young men passed his vehicle. Later two men approached the vehicle. Anderson saw a young man hit the window twice with a baseball bat. He heard shots and glass breaking. Later that evening the police found two casings from a .22 caliber rifle at

the scene as well as broken glass in the street. The windows in the car were shattered and there was blood all over the passenger's side of the car.

▮ Based on a review of the record in this case, we conclude that the independent evidence and the defendant's own statements established the *corpus delicti* of the offense. In combination, the independent evidence and the defendant's statements showed that Halmon took a substantial step toward the commission of an armed robbery. (See *People v. Howard* (1991), 147 Ill. 2d 103.) We therefore uphold Halmon's conviction for attempted armed robbery. Accordingly, we need not address the defendant's related argument that reversal of that conviction would now remove the aggravating factor which provided the basis for his eligibility for life imprisonment and which resulted in the trial court's subsequent imposition of an 80-year sentence for murder.

### SENTENCING

▮ In his final argument Halmon charges that the trial court abused its discretion in sentencing him to an extended-term sentence of 80 years for the murder of Joyce Partridge. In light of the action taken in this appeal, we do not reach this point. If on remand the trial court finds that some or all of the evidence is tainted by the defective arrest, a new trial is required. Alternatively, if the evidence is found to be untainted, the trial judge can review the sentence in light of this court's action and redetermine whether an extended term is appropriate.

Accordingly, for the reasons set forth above, the decision of the trial court is reversed and remanded with directions to proceed in accordance with this opinion.

Reversed and remanded with directions.

McNULTY, P.J., and LORENZ, J., concur.